Filed 8/21/25 (unmodified opn. attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B336249 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. KA133547 |
| v. | |
| GREG WRIGHT, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendant and Appellant. | |

THE COURT:

Good cause appearing, the published opinion in the above-entitled matter, filed on August 20, 2025, is hereby modified as follows:

On page 18 of the opinion, the second sentence of the Disposition shall be modified to read "The case is remanded for full resentencing in compliance with this opinion."

The petition for rehearing is denied.

_____

WILEY, Acting P. J.        VIRAMONTES, J.        RUBIN, J.*

* Retired Presiding Justice of the Court of Appeal, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 8/20/25 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| THE PEOPLE, | B336249 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. KA133547 |
| GREG WRIGHT, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, David Brougham, Judge.  Conviction affirmed; remanded for resentencing.

Aaron J. Schecter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Ana R. Duarte, Kenneth C. Byrne, and David Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

On video, an unmasked Greg Wright robbed a gas station convenience store at gunpoint. Representing himself before the jury, Wright argued that, while he did indeed take the store's money, he was too intoxicated to form the intent to rob.

By using the words "specific intent," the court incorrectly instructed the jury about Wright's intoxication defense. This error was harmless, however, for the evidence uniformly showed Wright's intoxication, if it existed at all, did not impair him during his robbery. Harmless as well was an error we assume occurred during one sentence of the prosecutor's closing argument. Neither was there prejudicial cumulative error.

Wright identifies stumbles in sentencing. The prosecution concedes errors. We remand for resentencing.

Statutory citations are to the Penal Code.

I

Wright did not testify, so the only evidence from the crime scene was the testimony of the victim cashier and the video from the camera system at the convenience mart.

In summary, the cashier testified Wright showed no sign of intoxication while robbing the store.

In more detail, the cashier said Wright entered the store around midnight and asked for a lighter, which the cashier gave him. Wright handed the cashier a dollar. The cashier said the lighter cost $1.10. Wright reached into his pocket. The cashier thought Wright was digging for a dime, but instead Wright pulled a gun. Wright scared the cashier by pointing the gun at him.

The cashier said, "Hey, there's cameras."

Wright said, "I'll take all the money as well."

The cashier asked, "Are you serious?" Wright said "yes." The cashier asked, "Even the ones?" Wright said "yes."

Wright took all the money.  He took back his dollar, and he took the lighter.  The total was over $600.

The cashier smelled no alcohol on Wright.  Wright was not slurring his words.  He did not have a confused or dazed look in his eyes.  The cashier said Wright looked "normal."

The cashier called the police, gave them Wright's license plate number, and later identified Wright.

Representing himself at trial, Wright cross-examined the cashier.  Wright tried to insert his own testimony into this cross-examination.

"Q by Mr. Wright:  And my point to this is that — is that, I have a drinking problem and I probably just blanked out because when I see that camera, the first time that I had seen that, I never knew that I had done that.

"Prosecutor:  Objection.

"The Court:  Mr. Wright, I have to ask you to ask him a question.  And I appreciate, there's other forums for you to provide testimony.  But I have to ask you — you're welcome to ask any questions about his observations about whether you had been drinking that morning or not."

The cashier denied seeing any sign Wright had been drinking.

The gas station's video system recorded Wright's robbery from six angles.  The videos captured separate views and phases of the robbery, which took less than a minute from entry to exit.

Exterior cameras recorded Wright driving into the store's parking lot.  We see that Wright has his headlights on.  He U-turns and parks.  Wright's driving remains competent throughout.  Nothing suggests a drunk driver.

Wright gets out and saunters into the store.

The interior cameras reveal the store has about three aisles. The walls are glass-paneled refrigerators holding drinks and such. We see the cashier at the register, with his older coworker in the background stocking store inventory off a rolling cart. The coworker glances at Wright and then returns to restocking.

Initially, Wright acts like an ordinary customer. He stands at the counter with his hands in his pockets.

At no point does Wright lose balance, wobble, or reach for the counter to steady himself.

Wright looks around at the coworker behind him before returning his gaze to the cashier.

Throughout the robbery, the cashier's coworker remains unaware of the robbery occurring just 10 or 15 feet away: this coworker calmly continues restocking and manifests no reaction to events at the cash register.

Wright takes a gun from his right pocket and points it at the cashier. Wright leans forward, using his body to screen the gun from the coworker's sight line. Wright speaks in a low tone, apparently inaudible to the coworker. Wright then deftly returns the gun to his right pocket.

In the span of three seconds, then, Wright has flashed his gun for only the cashier to see and then discreetly concealed it again.

The cashier begins handing Wright cash from the register. Wright takes the money with his left hand, puts the cash in his left pocket, and leaves his right hand in his right pocket with the gun. This process takes 12 seconds as the cashier doles bills out in batches and Wright collects them. Wright snatches the lighter and takes swift and large strides to the door—a change from his entering saunter. Without difficulty, he steps down from a curb to

4

the parking lot, gets in his car, and drives away. Again the driving is unexceptional.

Nothing hints at intoxication.

Police arrested Wright alone in the getaway car the next day. They found a loaded pistol in the car, but no other ammunition besides the cartridges in the gun.

The prosecution charged Wright with robbery (§ 211; count 1), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2), and unlawful possession of ammunition (§ 30305, subd. (a)(1); count 3). The prosecution alleged a firearms enhancement under § 12022.5, subdivision (a) on count one. The prosecution also alleged Wright had suffered 13 prior strike convictions (§§ 667, subds. (b)-(i) & 1170.12).

The jury convicted Wright on all counts and found true the allegations about the firearm use and the 13 prior convictions.

Eleven of the 13 prior convictions arose from one case against Wright on November 9, 2001. Wright claimed these 11 felony convictions arose from a single incident when he robbed a McDonald's where there were 11 victims.

The trial court sentenced Wright to 36 years and four months to life. This total was the sum of 25 years to life for count 1 (pursuant to the Three Strikes Law); 10 years (the upper term) for the firearm enhancement on count 1; and 1 year 4 months on counts 2 and 3 (one third of the 2-year middle term, doubled pursuant to the Three Strikes Law).

Under subdivision (b)(2) of California Rules of Court, rule 4.421, the court imposed the upper term of 10 years on the firearm enhancement because Wright's prior convictions were "numerous."

II

It was error to include the words "specific intent" in the jury instruction about the intoxication defense. The error, however, was

5

harmless by any standard. Wright's other arguments about his conviction likewise lack merit. However, Wright properly identifies two sentencing errors on which the prosecution confesses error and on which we remand.

A

Wright argues the trial court misinstructed the jury about his intoxication defense by inserting the words "specific intent" to describe the required mental state. This charge of error is valid, but the error was harmless.

With our italics, the court instructed the jury as follows.

"The defendant is charged in Count One with robbery.

"To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant took property that was not his own;

2. The property was in the possession of another person;

3. The property was taken from the other person or his or her immediate presence;

4. The property was taken against that person's will;

5. The defendant used force or fear to take the property or to prevent the person from resisting;

AND

6. When the defendant used force or fear, *he intended to deprive the owner of the property permanently*."

This instruction is not the one about which Wright is complaining, but is vital to our analysis because it identifies the mental state required for robbery: *the intent to deprive the owner of the property permanently*.

This mental state definition emerged from cases like *People v. Avery* (2002) 27 Cal.4th 49, 55 (*Avery*).

*Avery* held that "to determine the exact nature of California's intent requirement, we must turn to the common law." (*Avery*,

6

*supra,* 27 Cal.4th at p. 55.) *Avery*'s common law analysis found that "this requirement is satisfied by the intent to take the property only temporarily, but for so extended a period of time as to deprive the owner of a major portion of its value or enjoyment." (*Id.* at p. 52.)

The precise definition of the required mental state thus came from the Penal Code, as the high court interpreted it in light of the common law. (See *Avery, supra,* 27 Cal.4th at pp. 54–58.)

We repeat that Wright does not dispute this instruction about the elements of robbery. He focuses rather on the different instruction about his intoxication defense.

We quote this intoxication instruction as the trial court gave it, adding italics.

## "DEFENSES AND INSANITY SERIES
### "3426. Voluntary Intoxication (Pen. Code, § 29.4)

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with *Specific intent* for count 1.

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"In connection with the charge of [Count] 1, the People have the burden of proving beyond a reasonable doubt that the defendant acted with *Specific intent* for count 1. If the People have not met this burden, you must find the defendant not guilty of [Count] 1.

"You may not consider evidence of voluntary intoxication for any other purpose. Voluntary intoxication is not a defense to Counts 2 and 3."

7

As the italics show, the instruction, as given, use the words *specific intent* twice. This was double error. Wright correctly notes it was legal error to use the words "[s]pecific intent" rather than the *intent to deprive the owner of the property permanently*.

"A court has no sua sponte duty to define terms that are commonly understood by those familiar with the English language, but *it does have a duty to define terms that have a technical meaning peculiar to the law*." (*People v. Bland* (2002) 28 Cal.4th 313, 334, italics added.)

"Specific intent" is a formulation *peculiar to the law*. As the CALCRIM committee states, "specific intent" is a "term of art." (CALCRIM p. xxii.)

The words "specific intent" should be avoided altogether in jury instructions, for no one is exactly certain what "specific intent" means. The term is famously, and fatally, ambiguous. It is a term of art, but it is bad art.

"Specific intent" is commonly used in contrast with "general intent." But no one is certain what "general intent" means either.

Modern criticism of the categories of "general intent" and "specific intent" has been scathing and sustained. Esteemed critics have condemned the classification of crimes by general and specific intent. Critics include the California Supreme Court and California's Advisory Committee on Criminal Jury Instructions, and there are many others too.

Half a century ago, Chief Justice Traynor wrote that "[s]pecific and general intent have been notoriously difficult terms to define and apply, and a number of text writers recommend that they be abandoned altogether." (*People v. Hood* (1969) 1 Cal.3d 444, 456.) Chief Justice Traynor noted assault, for instance, is appropriately characterized as a specific intent crime, but equally well characterized as a general intent crime. (*Id.* at pp. 457–

458.)  This is unfortunate, of course, for a taxonomy that classes the same thing as two different things fails a basic function of any taxonomy, which is to keep things straight.

The California Supreme Court repeatedly has echoed the Traynor critique of specific and general intent.  (E.g., *People v. Hering* (1999) 20 Cal.4th 440, 445 [The terms specific and general intent have been difficult to define and apply and even perhaps have proved to be mischievous.  "In any event, courts should avoid rote application"]; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1126–1127 (*Mendoza*) ["The division of crimes into two categories, one requiring 'general intent' and one 'specific intent,' is both simplistic (some crimes have other required mental states such as knowledge) and potentially confusing"].)

With gusto, others have joined this chorus of condemnation.

"Modern scholars criticize the terminology of general and specific intent on five grounds.

"First, [this terminology] is ambiguous:  An offender who acted with 'general intent' may have acted with (a) no excuse, (b) a proven intent to achieve the actual results of her conduct only, (c) a presumed (rather than proven) intent to achieve the actual results of her conduct, or (d) recklessness or negligence.  An offender who acted with 'specific intent' may have acted with (a) the culpable mental state required by the definition of an offense, (b) a proven intent to achieve some result beyond that actually achieved, (c) a proven (rather than presumed) intent to achieve the actual results of her conduct, or (d) intent (rather than recklessness or negligence).

"Second, a distinction between general and specific intent is not very useful for an offense with more than two elements.  Consider burglary, which might be defined as (1) entering the (2) dwelling (3) of another (4) without permission (5) with the intent to

9

commit a felony therein.  Which of these five elements must the offender intend?  It does no good to say burglary is a specific intent offense, because that implies that the intent to enter is not enough.  There are four other elements.  Which of these must the offender specifically intend?

"Third, the terminology of general and specific intent wrongly implies that intent is the only kind of mental culpability possible.  A lawmaker might wish to condition burglary on intending to enter a building and commit a felony, while being reckless or negligent as to whether the building is a dwelling and whether the actor has permission to enter.

"Fourth, 'general intent' is often a misleading euphemism: an offense that conditions liability on having reasons to expect a result or know of a circumstance is a crime of negligence, not intent.  If the term 'general intent' means culpability for undesired results, it is too imprecise: it does not distinguish between results the actor actually expected and those the actor merely had reason to expect.  It also does not distinguish among results that seem certain, probable, or possible.

"Fifth, even though the phrase 'general intent' need not mean 'presumed intent,' it is best avoided because of its historic association with unconstitutional presumptions."  (Kaplan et al., Criminal Law: Cases and Materials (6th ed. 2008) p. 204.)

Other respected voices echo these critiques.  (E.g., Fletcher, Rethinking Criminal Law (1978) pp. 453–454 [offering three different definitions of specific intent and four of general intent]; 3 Encyclopedia of Crime & Justice (2002) Mens Rea, pp. 996–997 [distinction between specific and general intent "has been largely abandoned" because it "rested upon no coherent conception, which made it difficult to determine reliably into which category an offense fell"]; LaFave, Criminal Law (4th ed. 2003) p. 252 ["Much of

10

the existing uncertainty as to the precise meaning of the word 'intent' is attributable to the fact that courts have often used such phrases as 'criminal intent,' 'general intent,' [and] 'specific intent' "]; LaFave, at p. 253 [" 'General intent' is often distinguished from 'specific intent,' although the distinction being drawn by the use of these two terms often varies"]; Dressler, Understanding Criminal Law (4th ed. 2006) p. 146 ["The terms 'specific intent' and general intent' are the bane of criminal law students and lawyers. … [T]he concepts are so 'notoriously difficult to define and apply'" (fns. omitted)].)

Critics include the Advisory Committee on Criminal Jury Instructions.  This CALCRIM committee explains the CALCRIM instructions "do not use the terms general and specific intent because while these terms are *very familiar* to judges and lawyers, they are novel and often *confusing to many jurors*. Instead, if the defendant must specifically intend to commit an act, the particular intent required is expressed without using the *term of art* 'specific intent.' "  (CALCRIM p. xxii, italics added.)

The terms general and specific intent are "*very familiar*" to judges and lawyers, but common usage has not created objective clarity or precision.  Professor William Roth, for instance, wrote that during his three and a half years as a deputy public defender and four years as a deputy district attorney, "he knew that he did not understand the terms [specific and general intent] and did not meet anyone who seemed to possess any modicum of true understanding." (Roth, *General vs. Specific Intent:  A Time for Terminological Understanding in California* (1979) 7 Pepp.L.Rev. 67, 70, fn. 18.)  Roth adds that use of the terms general intent and specific intent is "a continuing source of confusion in criminal law. The meanings are amorphous and serve little purpose." (*Id.* at p. 67.)  Roth echoes the criticism of others:  "Because crimes generally

11

consist of several elements (*i.e.*, different things that must be proved), a problem of intent (or blameworthiness) exists as to *each* element." (*Id.* at p. 69.) Roth concludes the continued usage of general and specific intent is "counterproductive." (*Id.* at p. 68.)

The labels general and specific intent ignore the fact that one crime can have different elements, each of which can have a separate mental state requirement. The general and specific intent labels thus are too "simplistic." (*Mendoza, supra*, 18 Cal.4th at p. 1127.)

The voluntary intoxication statute in this case reinforces the critique. With our italics, it states:

"(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed *a required specific intent*, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4.)

This statute does not define the term "specific intent."

Notably, the statute refers to "*a* required specific intent" rather than "*the*" specific intent. This usage shows the Legislature did not express, or imply, that "specific intent" is one particular state of mind. Rather, the Legislature effectively directed courts to fill in the proper crime-specific mental states, which can vary depending on the charges against the defendant. Here, the pertinent mental state is the *intent to deprive the owner of the*

12

*property permanently*. That is what the intoxication instruction should have stated.

In sum, "specific intent" does not have one fixed meaning. It can have different meanings that vary from one usage to another.

Courts are the ones that must construe the statute to determine *which* "specific intent" applies in a given case. Courts strive for clarity and precision when crafting jury instructions. We fail in this endeavor when we replace a precise and settled formulation—*intent to deprive the owner of the property permanently*—with the vague and undefined category of "specific intent."

To reiterate this vital point, the *Avery* decision and the sources it consulted gave the precise mental state required in this case: the *intent to deprive the owner of the property permanently*, which is "satisfied by the intent to take the property only temporarily, but for so extended a period of time as to deprive the owner of a major portion of its value or enjoyment." (*Avery, supra*, 27 Cal.4th at p. 52.)

No evidence in this robbery case suggested Wright intended to take the money *only temporarily*. The crucial state of mind, and the one the intoxication instruction should have included, therefore was the *intent to deprive the owner of the property permanently*.

It thus was error to use the vague and protean words "specific intent" in this jury instruction.

Nonetheless, this instructional error was harmless by any standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24, 26.)

Beyond all doubt, Wright was not "blacked out" during the robbery, as he claimed in his cross-examination of the cashier and in his closing argument.

On the contrary, the evidence shows Wright was fully functional. He displayed no sign of impairment. He did not smell

13

of drink or slur his words.  His conversation with the cashier was responsive and clear.  A witness described his appearance as "normal."  Judged by his actions, then, Wright's thinking during the robbery was purposeful.  Wright's actions revealed his cogent plan:  to enter casually, selectively to scare the cashier by flashing his gun, to conceal the gun from the co-worker to avoid interference, to get the money, and to get away fast.  Wright worked efficiently.  He did not dawdle, lose focus, or display trance-like conduct.

The issue for the jury was whether intoxication, if any, removed Wright's ability to form the intent to deprive the owner of the money permanently.  The evidence of Wright's actions uniformly displayed this intent during the robbery.  There was no contrary crime-scene evidence.

The mental state error in the jury instruction was harmless by every standard.  It could not have affected the verdict.

B

We assume Wright is correct that the prosecution erred in closing argument.  This assumed error was harmless.

We assume the prosecutor erred by making this statement in rebuttal:

"It would lead to some absurd results if somebody could just say — if somebody decided to drink a whole bottle of vodka and decided to rob a store and say sorry, I was blacked out drunk, I can't be held responsible for that."

Wright argues this was error because someone who is too intoxicated to form a criminal intent is not criminally liable.

For purposes of analysis, we assume Wright has a point, but it does not matter in this case:  under any standard, this one sentence of argument could not have affected the result.  As we have explained, no evidence from the scene suggested alcohol

affected Wright during the robbery.  The blackout-drunk claim was an argument only, unfounded in evidence.  Under any standard, the prosecutor's bottle-of-vodka sentence had no effect on the trial or verdict.

## C

Wright argues that cumulative errors afflicted the verdict.  Assuming there were cumulative errors, they could not have caused Wright prejudice.  Wright admitted he was in the robbery video but claimed he was too drunk to intend to rob.  The video and the eyewitness, however, portray a robber unimpaired by intoxicants.

## D

Wright correctly contends the trial court erred in imposing multiple punishments for count two—felon in possession of a gun—and for count three—illegal possession of ammunition.  As Wright points out, the only ammunition was that in the pistol, so possessing the firearm and possessing the ammunition inside were one "act" within the meaning of section 654.

With our italics, subdivision (a) of section 654 provides that "An *act* . . . that is punishable in different ways by different provisions of law may be punished under either of such provisions, but *in no case shall the act . . . be punished under more than one provision.*"

The prosecution concedes the point.  It suggests remand is unnecessary but offers no authority for its proposal that this court, rather than the trial court, should resentence Wright.  We reject this unsupported idea and remand for the trial court to resentence Wright in compliance with section 654.

## E

On a different sentencing issue, Wright validly points out the trial court denied Wright's right to trial by jury on a sentencing enhancement.

The Supreme Court of the United States decided *Erlinger v. United States* (2024) 602 U.S. 821 (*Erlinger*) after the trial court sentenced Wright. *Erlinger* held that virtually any fact that increases the prescribed range of penalties to which a criminal defendant is exposed must be resolved by a unanimous jury beyond a reasonable doubt or freely admitted in a guilty plea. "Judges may not assume the jury's factfinding function for themselves, let alone purport to perform it using a mere preponderance-of-the-evidence standard." (*Id*. at p. 834.)

The error here was that Wright was entitled to, but did not receive (or waive), trial by jury on the aggravating factor of whether he had suffered "numerous" convictions in the past. (California Rules of Court, Rule 4.421(b)(2).)

Citing *Erlinger*, the prosecution concedes error.

The prosecution argues this error was harmless because Wright suffered many prior convictions.

Our standard of review, the parties agree, is whether we can conclude beyond a reasonable doubt that a jury would have found true "all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements." (*People v. Lynch* (2024) 16 Cal.5th 730, 768 (*Lynch*); see also *People v. Wiley* (2025) 17 Cal.5th 1069, 1076, (*Wiley*).)

There are, as the prosecution admits, factual uncertainties about the number and character of Wright's convictions.

How many convictions were there, exactly? That depends on how you count. The prosecution says 13, but it concedes that 11 of the 13 arose from a single case against Wright.

Wright contended at trial he suffered only *three* convictions from separate episodes. He claimed at trial that 11 charges arose from his robbery of a San Bernardino McDonald's where 11 people were at the restaurant.

The factual details from this McDonald's incident are not in the record.

Wright argues a reasonable jury *might* have treated his one McDonald's robbery as a single aggregated signifier of culpability.

We reject the prosecution's response. This response equates:

- one robbery episode at one establishment involving a group of 11 victims with
- 11 different decisions to rob 11 different places on 11 different days.

This response is unreasonable because it leads to implausible conclusions.

For instance, robbing one bank, as well as the 30 customers who happen to be there that day, is culpable. But it is not *as* culpable as 31 separate robberies on 31 different days. Staggeringly determined robbers have more time to reflect than a one-time robber who, in one episode, exploited simultaneous opportunities in the moment. To equate the level of culpability in these two situations—as a mandatory *legal* holding—is untenable.

We cannot predict with confidence exactly how a jury would size up the factual issue of Wright's criminal history. Three robberies in the course of 49 years of life may strike some jurors as an obviously "numerous" number of convictions, but we are unsure 12 people unanimously would agree with this evaluation beyond a reasonable doubt.

17

Earlier this summer our Supreme Court emphasized that making factual findings about whether past convictions arose from actions on separate occasions "is not as straightforward as it might appear." (*Wiley, supra*, 17 Cal.5th at p. 1080.) This project can require examining many facts, including temporal proximity, geographic propinquity, and whether the purposes and characters of the offenses were similar. (*Ibid.*)

"Presented with evidence about the times, locations, purpose, and character of those crimes, a jury might have concluded that some or all occurred on different occasions. Or it might not have done so. All we can say for certain is that the sentencing court erred in taking that decision from a jury of [the defendant's] peers." (*Erlinger, supra*, 602 U.S. at p. 835.)

We remand the case for resentencing in compliance with *Erlinger, Wiley,* and *Lynch.*

## DISPOSITION

The convictions are affirmed. The case is remanded for resentencing in compliance with this opinion. The trial court furthermore shall specify the basis for fines and fees. (See *People v. High* (2004) 119 Cal.App.4th 1192, 1200.) As the parties agree and we concur, the trial court also must cure two errors in the Abstract of Judgment:

- in section six, the Determinate Form CR-290 must show no time; and
- section one of the Indeterminate Form CR-292 should have no entry in the box labeled "Additional counts are listed of attachment." Neither should the blank line labeled "(number

18

of pages attached)" have the number two entered.  Instead, that blank line should remain blank.



                                    WILEY, Acting P. J.

We concur:


       VIRAMONTES,  J.         RUBIN, J.*

---

* Retired Presiding Justice of the Court of Appeal, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.